**No. 24-1656**

---

United States Court of Appeals
For the First Circuit

_____

LINDA CRAWFORD

*Plaintiff-Appellant,*

*v.*

SALVE REGINA UNIVERISTY; SALVE REGINA UNIVERSITY BOARD OF
TRUSTEES, through its President, Dr. Kellie J. Armstrong; JAMES G.
MITCHELL, Chair, SRU Department of Modern Languages and President, Salve
Regina AAUP CCHP; ESTHER ALARCON-ARANA, Faculty, SRU Department
of Modern Languages; EMILY COLBERT-CAIRNS, Faculty, SRU Department of
Modern Languages,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Rhode Island
in Case No. 1:23-cv-00380-MSM, Judge Mary McElroy

_____

**BRIEF OF APPELLANT LINDA CRAWFORD**

_____

STEPHEN T. FANNING
305 South Main Street
Providence, RI 02903
(401) 272-8250
Stephenfanning@msn.com
March 13, 2025

## TABLE OF CONTENTS

**Page**

**TABLE OF CONTENTS** ................................................................... i

**TABLE OF AUTHORITIES** ...........................................................iii

**JURISDICTIONAL STATEMENT**.............................................. 1

**STATEMENT OF THE ISSUE**................................................... 1

**STATEMENT OF THE CASE**.................................................... 1

**STATEMENT OF FACTS**........................................................... 3

**SUMMARY OF ARGUMENT**.................................................. 18

**ARGUMENT**............................................................................ 18

    I.    **AS TO THE ISSUE OF DISCRIMINATORY TERMS AND CONDITIONS OF EMPLOYMENT INVOLVED FACTUAL QUESTIONS THAT COULD NOT BE RESOLVED AT THE DISMISSAL STAGE, THE DISTRICT ERRED IN GRANTING DEFENDANT'S 12(B)(6) MOTION** ....................................................18

        a.  **The Relevant law** ..............................................................19

        b.  **The District Court's determination that the Plaintiff's factual allegations did not yield a plausible claim that her membership in any of the submitted protracted classes played a role in her termination was clearly erroneous**……………………………….....19

        c.  **The Complaint plainly sets forth a Plausible Claim that Plaintiff's membership in a protected class(es) played a role in her termination**………………………………………………………23

        d.  **The Complaint plainly supports the allegation that Plaintiff was subject to disparate treatment**…………………………………..24

i

4881-4565-5036, v. 2

**II.    THE DISTRICT COURT FURTHER ERRED IN DISMISSING THE COMPLAINT'S ALLEGATION THAT PLAINTIFF WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT.…………………………..…………………25**

   a.  The Relevant Law………………………………………………….25

   b. Application of the Law to the Assertions Averred in Plaintiff's Complaint…………………………………………………… 26

**III.    THE DISTRICT COURT FURTHER ERRED IN DISMISSING PLAINTIFF'S RETALIATION CLAIMS………………………….32**

   a.  The Relevant Law………………………………………………. 32

   b. Application of the Law to the assertions averred in Plaintiff's Complaint…………………………………………………. 32

   c. As the Complaint, then, contained sufficient averments to Maintain a Title VII and Title IX Cause of Action, the District Court erred in granting the employer's Rule(12)(b)(6) Motion to dismiss the Plaintiff's retaliation claim……………… 33

**IV.    THE DISTRICT COURT FURTHER ERRED IN FAILING TO CONVERT THE DEFENDANTS' MOTION UNDER FRCP 12(B)(6) TO A RULE 56 MOTION FOR SUMMARY JUDGMENT, WITH RESULTING DISCOVERY …………………………………35**

**CONCLUSION……………………………………………………… 42**

4881-4565-5036, v. 2

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                      <u>**Pages**</u>

*McDonnell Douglas Corp. v. Green* 411 US 792 (1973)……………………….19

*DeCamp v. Dollar Stores, Inc.*  875 A2d. 13, 21-22 (RI 2005)……………19,26,31

*Ing v. Tufts University*, 81 F.4th 77, 82 (1st Cir. 2023) …………………………  19

*Velez v. Thermo-King de Puerto Rico, Inc.* 585 F.3d 441,
446-47 (1st Cir. 2009)…………………………………………………………… 19

*Bhatti v. Trs. of Boston Univ.*, 659 F.3rd 70 (1st Cir. 2011)………………………19

*Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9 (1st Cir. 2024)………24,32

*Banco Santander de P.R. v. Lopez—Stubbe (In re Colonial Mortg. Bankers Corp.)*,
324 F.3d 12 (1st Cir. 2003)...............................................................................24

*Bell Atl. Corp. v. Twomby*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)
.............................................................................................................................24

*Franchina v. City of Providence,* 881 F.3d. 32, 45 (1st Cir. 2018)………………..26

*Rivera-Rivera v. Medina & Medina, Inc.,* 898 F.3rd 77, 91 (1st Cir. 2018)……..  26

*Flood v. Bank of America, Corp.*, 780 F.3d 1, 10 (1st Cir. 2015)……………….. 26

*Meritor Savings Bank, FSB vs. Vinson*, 477 U.S. 57, 69 (1986)…………………29

*Cabon v. Caribbean Transportation Services, et al.*, 2005 US Dist. Lexis
38305..................................................................................................................30

*Pinkerton v. Colorado Department of Transportation*, 563 F.3d. 1052 (10th Cir.
2009)…………………………………………………………………...……..30

*Harris v. Forklift Systems, Inc.* 510 U.S. 17,21 126 L.E.d. 2d. 295 (1993)……..  31

4881-4565-5036, v. 2

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)……………………………….31

*Crowley v. L.L.Bean, Inc.*, 303 F.3d 387 (2002……………………………….. 31

*Dixon v. Intl' Bhd. of Police Officers*, 504 F.3d 73 (1st Cir. 2007)…………….32

*Reliance Insurance Co. v. City of Boston*, 71 Mass.App. Ct. 550,555 (2008)….37

*Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013)………………….39

*Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17(1st Cir. 1998)…………39

*Bodman v. Me., Dep't of HSS*, 720 F. Supp., 2d 115, 199 (D.Me. 2010)………40

*Forrest v. Brinker International Payroll Co.*, 511 F.3d 225 (1st Cir. 2007)…….40

*Garcia-Catalan v. United States*, 734 F. 3d 100, 103 (1st Cir. 2013)……………41

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)………………………………… 41

*Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40 (1st Cir. 2012)……………42

## Statutes

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1367 ...............................................................................................1

28 U.S.C. § 1291 ...............................................................................................1

RI Civil Rights Act of 1990 (R.I.G.L §42-112-1 et. seq.)…………………….. 2

RI Fair Employment Practices Act (R.I.G.L §28-5-1 et seq.)………………….. 2

Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000 et seq.)…………… 2

Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)…… 2

Age Discrimination in Employment Act (29 U.S.C. et seq.)…………………… 2

4881-4565-5036, v. 2

v

4881-4565-5036, v. 2

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (jurisdiction over civil actions arising under the Constitution and laws), and pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction). This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1291 (final judgment of the District Court).

## STATEMENT OF THE ISSUE

Whether the District Court erred in granting, pursuant to Rule 12(b)(6) of the federal rules of civil procedure, Defendants' motion to dismiss Plaintiffs' Complaint as to the Plaintiff's state and federal anti-discrimination claims (Counts V-IX). The Court declined to exercise supplemental jurisdiction over the Plaintiff's remaining claims and those claims were remanded to the Rhode Island Superior Court, Newport County.

## STATEMENT OF THE CASE

On June 7, 2023, Plaintiff Dr. Linda Crawford (hereinafter "Crawford") filed a Verified Complaint in the Superior Court of Rhode Island, Newport County (CA. No. 2023-0189), alleging that Defendants unlawfully discriminated against her and engaged in other unlawful conduct as follows:

Count I: Breach of Contract

Count II:  Intentional Infliction of Emotional Distress

1

4881-4565-5036, v. 2

Count III:   Defamation/False Light/Defamation Per Se

Count IV:   Tortious Interference with a Contractual Relationship

Count V:     Rhode Island Civil Rights Act of 1990 (R.I.G.L. §42-112-1 et seq.)

Count VI:   Rhode Island Fair Employment Practices Act (R.I.G.L. §28-5-1 et seq.)

Count VII:  Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000 et seq.)

Count VIII: Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)

Count IX:  Age Discrimination in Employment Act (29 U.S.C. §621 et seq.)

On September 13, 2023, Defendants filed a Notice of Removal in the United States District Court.  On November 17, 2923,  Defendants filed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss the entirety of Plaintiff's Verified Complaint.  Following Plaintiff's March 18, 2024, response to Defendants' dismissal motion, and the Defendants' April 5, 2024, reply to Plaintiff's response, the District Court, the Honorable Mary S. McElroy, filed a Memorandum and Order on June 18, 2024 granting Defendants' motion to dismiss Plaintiffs' Verified Complaint as to the Plaintiff's state and federal anti-discrimination claims (Counts V-IX).  The Court declined to exercise supplemental jurisdiction over the Plaintiff's remaining claims and those claims were remanded to the Rhode Island Superior Court, Newport County.

Despite Plaintiff's request for a hearing in her response to Defendants' Motion to Dismiss, no hearing was held on the Defendants' dismissal motion and there were

no oral arguments by the parties.  A timely appeal was then taken to this Honorable Court by the Plaintiff.

## STATEMENT OF FACTS

The most relevant facts, as averred in Plaintiff's Verified Complaint, and the attached exhibits, are that:

Plaintiff, Linda Crawford, is a Caucasian female.  She identifies as heterosexual.  Plaintiff is a Christian.  Plaintiff was born X-X-1964, and at all times cited in the complaint was in the state and federal legally protected age category.

At the time of the events at issue in this matter, Plaintiff held the position of a full *tenured* professor of Spanish with 23 years of service to the Defendant university, Salve Regina (hereinafter Salve).   She was granted tenure in 2004. Plaintiff asserts that she maintained a positive record of employment with the Defendant, demonstrated in part by the school's decision to grant her tenured status, which was maintained for almost 20 years prior to her discharge; and believed, in good faith, that she would enjoy a lengthy career in her position.  A review of Plaintiff's evaluations over the last several years prove that there have been no negative trends in her performance or deviations of her adherence to her teaching responsibilities.  (Complaint, ¶15)

4881-4565-5036, v. 2

In January 2022, Plaintiff was abruptly informed by Salve that she was terminated allegedly "for cause" including what the university characterized as "continued misconduct," failure to communicate, and failure to comply with the requirements of a faculty member in accordance with the Faculty Manual.   The effective date of her termination was January 3, 2022. (¶17)

The allegations and evidence upon which the Defendant Salve and Defendant Board of Trustees primarily relied with respect to Plaintiff's termination consisted of unsworn, anonymous,  and unreliable statements by students and biased faculty which were *actively solicited* and encouraged by administrative personnel, apparently  after the school had already made the premature decision to engineer the termination of the Plaintiff without adequate cause, in an *ex post facto* effort to lend an air of legitimacy to an unsupportable discharge decision. (¶18)  In reality, there was no reliable or persuasive evidence that the Plaintiff was incapable of fulfilling basic faculty responsibilities, working effectively with colleagues, or managing communications with students and staff in a productive manner.  Despite the university's attempt to portray alleged misconduct as the reason for  Plaintiff's termination, there is no evidence whatsoever that the Plaintiff had a history of problematic performance with the Defendant Salve. (¶19)

Notably, on the same date of Plaintiff's termination, without benefit of any conference with the President of the University and prior to any proceedings before

4

4881-4565-5036, v. 2

the Faculty Hearing Committee, Plaintiff was offered a severance agreement, requiring her to waive all of her potential claims. This offer was made before the university had taken any meaningful steps to apprise the Plaintiff of the nature or specific facts underlying her alleged misconduct, indicating that Salve's termination decision was a *fait accompli*, notwithstanding the evidence. (¶20)

Salve alleges that Plaintiff's termination was triggered by what the university alleged was an incident on November 15, 2021 during one of Plaintiff's classes. President of the Defendant University, Kelli Armstrong has asserted in writing: "the catalyst for my recommendation to terminate Dr. Crawford's employment at Salve results "from the class in question," referencing the class conducted by Plaintiff on the above-referenced date. She continued by saying that Plaintiff's actions are "a barrier to student learning and antithetical to Salve's Mercy mission." She goes on to falsely assert that the past seven years of Plaintiff's employment have been "fraught" with misconduct in the classroom and unacceptable teaching practices, allegations which are demonstrably untrue. The false statements that have been disseminated against the Plaintiff have created the impression that she is an adherent of hate and intolerance which is the antithesis of the Plaintiff's character and what she stands for as an educator and a human being. (¶23) This alleged behavior is clearly premised on Salve's animus towards

5

Plaintiff based on her gender, race, sexual orientation/identification, age and religion.

On the class date in question, as part of Plaintiff's class in Spanish American Culture and Civilization, Plaintiff led a discussion on Gender and Sexuality in Latin America. As part of this class, she assigned to her students for their review, a paper authored and published during or about 2003. This reading was consistent with the course content, as approved by the SRU administration, and examined the link between gender, sexuality and power in Latin America. Plaintiff asked her students to supplement assigned text readings with an additional reading that used the word "transvestites," a word the context of which has evolved since publication of the text in 2003. As noted above, the text examines the link between gender, sexuality and power in Latin America, a pertinent topic with respect to the applicable course. (¶24)

Dr. Crawford followed-up with a brief class discussion regarding LGBTQ+ rights in Latin American countries and the proposition that these rights *have not* evolved to the level such rights have evolved in the United States. (¶25) The assigned reading was directly related to the content of Plaintiff's course for adult college level students. (¶26)

During the class in question, a student who was later identified by the university simply as "Student D" (whose actual identity has been concealed by the

Salve, leaving the Plaintiff at a severe disadvantage in probing any bias or credibility of the alleged complainant) appeared to become upset because Plaintiff, who he described as a "cis White woman," (a comment clearly motivated by Plaintiff's race and sexual orientation) used a reading that contained the word "transgender." The student objected to the term "transgender" and had an outburst in class in an extreme and inappropriate reaction to the lesson plan. (¶27)

On November 16, 2021, Student D sent a message to Nancy Schreiber, University Provost and Vice President of Academic Affairs that he was "informed" by the Chair of the Modern Languages Department, Defendant Mitchell, to "mail [her] a formal complaint." (¶29) Any written complaint by this student was clearly solicited by the university or its agent, Department Chair Mitchell, and arguably lacks credibility, as Salve continues to conceal the alleged student's identity from the Plaintiff.

Student D followed through on Defendant Mitchell's directive and wrote a lengthy letter of complaint to the Provost. In his/her complaint the student explained his/her view that the article was "inappropriate and there are better ones out there….it would even be better if we read one directly from a latinx (sic) author instead of an Englishmen (sic) describing what happens in Latin America." This student stated that he informed the Plaintiff that he was a "transgender gay man" and she [Plaintiff] is a white straight cis woman, so she cannot tell me

7

[Student D] what I [Student D] find offensive." He went on to state that a student "found a book that was similar to the one we read but it was written by a Latinx author," suggesting that the students of SRU should have authority to override the syllabus and curriculum as designed by the professor. This student went onto state "word travels" and there are "several students within the language department hearing about this incident as well as all of the friends of people in our class." He went onto refer to the Plaintiff as "ignorant" and soliciting the Provost to "take action" against Plaintiff. This letter, and others, were demonstrably written at the direction and/or suggestion of Defendant Mitchell, and the alleged authors have never been identified. (¶30-34)    The alleged authors have never been identified in the absence of any discovery which was effectively precluded by the Trial Judge's dismissal decision.

Another student, labeled as Student C by the Defendant university similarly stated that he /she was "directed by an advisor [Defendant Mitchell] to email Provost Schreiber about "derogatory language regarding transgender people in Plaintiff's class."   Student C stated that he/she found the language at issue to be "triggering" and that Student C believed that the classroom should be a "warm and safe space."  (¶34)  Student C stated that she has heard multiple comments by teachers [other than the Plaintiff] and has "let them fly by."  Student C indicated

that her letter to the Provost stemmed from "seeing the reaction" of other unidentified students.  (¶35)

The record is devoid of any evidence that Dr. Crawford had a history of problematic conduct or student complaints regarding hateful speech.  Nevertheless, Salve used the above alleged incident as the "catalyst" [in the language of President Armstrong] for Plaintiff's termination and an onslaught of baseless and defamatory accusations towards the Plaintiff, and the chilling of her ability to teach freely and without censor.   Negative comments against the Plaintiff appear to have been solicited and encouraged by Defendant Mitchell, her Department Chair (as described below) and other Defendants. (¶36)

Specifically, Defendant Mitchell coordinated and participated in a meeting in his office with students regarding Plaintiff on November 15, 2021 (following the class in question).  (¶37)  This meeting was at Defendant Mitchell's overture, as an agent of the university, in what is believed, based on good faith information and belief, to be an effort to coordinate and rally student sentiment against the Plaintiff, a member of Mitchell's department.  (¶38)  At one point, based on his behavior, Dr. Crawford found it necessary to file a grievance against Mitchell.  (¶39)  On information and belief, during the above-referenced meeting with students, Defendant Mitchell encouraged and/or directed the students to submit written

statements to the university criticizing the Plaintiff, based solely on various protected categories of which she is a member.

Several students proceeded to draft and submit written "complaints" against Dr. Crawford to the Provost and President of the University (as described above). (¶40)  These statements were unsigned or have had signatures redacted, were unverified/unsworn and undated making them inherently unreliable, requiring the need for discovery on these issues.  (¶41)  These statements reflected in both tone and content allegations that were similar indicating that they were the product of a deliberately coordinated effort by students, influenced by certain faculty and administrators, to unfairly undermine the Plaintiff's reputation and denigrate her performance.   (¶42)

The university subsequently scheduled a zoom meeting for Plaintiff's students to "share what occurred in classes" this semester with the Plaintiff. Underscoring its clandestine efforts to undermine the Plaintiff, the university did not inform Plaintiff of the scheduling of this meeting, and did not allow Plaintiff to participate in the zoom meeting.  The university did not sequester the students and instead had them meet as a group.  Such action by the university created a "gang" mentality and tainted subsequent statements and any investigation of the matter. (¶43)  The university alleged that the students in the zoom meeting described Plaintiff as using "offensive language and hateful rhetoric" towards the LBGTQ+

10

4881-4565-5036, v. 2

community and people of color.  The university provided *no opportunity* to the Plaintiff to respond to these allegations or to defend herself, prior to her termination.  Also, as noted above, the record indicates that the sole "evidence" allegedly considered by SRU were redacted, unsworn and anonymous letters, drafted under clearly unfair, tainted, and arguably coerced circumstances.  (¶44) These activities were undertaken in a deliberate effort to terminate a tenured professor, based on her gender, age, race, sexual orientation/identification and religion.

SRU took no steps to properly investigate this matter.  (¶45)  SRUs Title IX coordinator failed to fully investigate, clarify or verify the allegations in this matter, prior to issuing a summary "Notice" to Plaintiff restricting certain of her duties, as referenced in the following paragraph.  (¶46)  Plaintiff was informed by the President of the university that an email dated November 22, 2021, was issued to Plaintiff by the Title IX coordinator regarding the allegations in this matter. Plaintiff has no recollection of ever receiving such an email. (¶47)  The email from Timothy J. Dunn, Title IX Coordinator, is dated November 22, 2021, implicating that he completed an investigation in less than a week from the date of the "catalyst" class on November 15, 2021.  There is no indication in Dunn's statement that he conducted *any*  thorough investigation, other than to assert that unnamed students alleged that the Plaintiff made comments that were derogatory toward "a

11

population based on that populations' [sic] gender identity or expression." It should be noted that Dunn's "so-called" investigation did not comport with any of the most basic requirements of a Title IX investigation.

Dunn then went on to talk about several of the referenced students in Plaintiff's class being members of the "Spanish Club" who expressed that they "do not feel safe around [Plaintiff]." There is no indication that Dunn's "Notice of Interim Action" followed his giving the Plaintiff a shallow opportunity to respond. In fact, Dunn did not even speak to the Plaintiff regarding the matter. Dunn notes however, that the "Notice" shall not be construed to indicate that the university has taken any disciplinary action against the Plaintiff, even though Plaintiff was ultimately fired six weeks later. (¶48) Plaintiff vehemently denies any misconduct as referenced in Dunn's perfunctory "Notice."

The Plaintiff appealed her termination pursuant to the requirements of the university's Faculty Manual. Prior to the hearing before the Faculty Committee, the Plaintiff's email account was deactivated and she had no access to messages in order to adequately prepare for the hearing. (¶54) She received no salary pending her appeal as her salary ceased on the date of her termination, contrary to established SRU protocols. (¶55)

Plaintiff attended an appeal hearing before the university's Faculty Committee. (¶56) During the hearing, Plaintiff was inappropriately forced to bear

4881-4565-5036, v. 2

the burden of *disproving* the university's allegations, undermining principles of academic freedom and due process. In fact, it is the university that should have had the burden of demonstrating adequate cause for dismissal based on a clear and convincing standard of record evidence considered as a whole. The burden shifting violated Plaintiff's due process rights among other rights, as supposedly ensured by faculty policies and the university's alleged commitment to its Mercy mission. (¶57)

The university's Faculty Manual's dismissal for cause procedures failed to conform with normative academic standards, absent institutional regulations affording such a procedure prior to dismissal. Plaintiff's tenure status was apparently in name only—violating any applicable contract regarding her tenured status, as well as the formally stated guarantees of free speech and academic freedom existing in SRU's governing documents and the Faculty Manual. (¶59)

Although Dr. Crawford was ultimately permitted, at her insistence, to have the above-referenced hearing before a Faculty Committee Board, she was not allowed to have an advisor or legal counsel speak on her behalf. (¶62)

In a decision dated June 7, 2022, the Faculty Committee affirmed the Plaintiff's termination. Even so, the Committee stated as follows:

*"It is clear to this Committee that the process to investigate Dr. Crawford was prejudiced and some of the information collected by the administration for the*

13

*cause of dismissal was biased. The addition of two more reasons for the dismissal in the April summary sent to the Committee suggests that the investigation carried on after the complainant was terminated in January and never fully explained. It appears that testimony from the department, alumni and students, was not solicited in an independent way but more haphazardly and unchecked in the Fall 2021 classroom incident, the views of all members of the class were not solicited. It was unclear even if a proper Title IX investigation was conducted yet sexual harassment was included in the reason for dismissal. Issues in the modern language department have been long standing and largely ignored by previous administration and human resources."* (¶65)

The decision was not unanimous, 3-2 in favor of the administration. The dissenting Faculty Committee Board opinion issued on behalf of two members stated that the "administration's firing of [Plaintiff] was unreasonable, unfair and prejudicial." It also asserts that the way in which the hearing process took place was not fair and reasonable to Dr. Crawford. (¶66)

The university cited four criteria warranting a tenured professor's dismissal for cause: incompetence; violation of contract; negligence and sexual harassment. (¶67) No persuasive evidence was presented to the Faculty Committee to substantiate or even suggest that Dr. Crawford had engaged in sexual harassment, was incompetent, negligent or violated the applicable contract. (¶68) The

14

administration failed to show any adequate evidence for these charges and, in the words of the dissenting Board members, "look[ed] strained in attempting to do so." Dissenting faculty members agreed that Dr. Crawford's performance was unfairly and unjustly manipulated.  (¶69)

This proceeding was clearly driven by a "mob" intent upon "cancelling" Dr. Crawford and destroying her career because the university did not like her teaching methods and were offended by her personal characteristics.  Upon information and belief, the Provost of the university and Plaintiff's Department Chair (Defendant Mitchell) informed Plaintiff's students at the start of the semester that they should keep a running list of criticisms about the Plaintiff and her teaching in what can only be described as a deliberate effort to sabotage her career and reputation.  (¶70)

The university encouraged and endorsed a discriminatory attack on Dr. Crawford.  For example, certain students took the position that Dr. Crawford had no right to teach about certain cultural norms in Latin America because she was a "cis white woman"  (¶71) further indicating a bias towards the Plaintiff's protected characteristics.

The Defendants took intentional and deliberate actions to discriminate against the Plaintiff because she was a member of several "dominant" or "majority" groups (white, straight)  in favor of members of a "minority" or

15

"historically disadvantaged" group.  On information and belief, the university replaced Plaintiff with respect to at least part of her teaching schedule with a male significantly younger than Plaintiff who is believed to be the husband of Defendant Alarcon-Arana.  (¶73)

The Plaintiff along with another senior faculty member have been referred to as "old school" because of their request that students use their titles and not their first names.  One student was informed that she may want a different advisor than the Plaintiff and one who was capable of "fresh ideas and perspectives" in a clear criticism of her age.   Plaintiff was also criticized for not using gender neutral endings in Spanish and told this was because she was "older."   The university repeatedly failed to provide the Plaintiff office assignments by seniority, instead opting to provide favorable office space to younger/junior faculty members.  (¶74)

As part of the dismissal process, letters were submitted to the university by certain of Plaintiff's colleagues, including Defendants Alarcon-Arana, Defendant Mitchell and Defendant Colbert-Cairns.  Notably, Defendant Colbert-Cairn's letter contains no specific date and only referenced "April 2022" and is unsigned.  Similarly, the letter of Defendant Alarcon-Arana is not dated. (¶75)  These letters contained defamatory, discriminatory and slanderous statements.  (See below)  No remedial action was taken by the university to address or investigate the

16

4881-4565-5036, v. 2

defamatory statements made towards Dr. Crawford by faculty and such letters remain part of Dr. Crawford's official file.  (¶76)

As part of the dismissal process, Dr. Crawford submitted numerous letters from colleagues *attesting* to her character and professional performance.  These letters were all signed, dated and appropriately verified unlike the letters proffered by the university against Dr. Crawford which were redacted, undated and patently unreliable.  The university gave no weight to the evidence in support of Dr. Crawford giving all weight and deference to the purported "evidence" against her. (¶77)

There is ample evidence to indicate that other faculty members have been treated with far greater deference that Dr. Crawford in the face of more serious accusations.  For example, upon information and belief, a *male* administrator of the Modern Languages Department was involved in a concerning legal matter. The university allowed this male to "step down" from his position and awarded him full tenure, two sabbaticals and several course reductions.   (¶78)   The Plaintiff was the first and only tenured full professor subject to termination proceedings.  (¶79) The university denied Dr. Crawford mediation despite mediation being dictated by the applicable contract and the University's Faculty Manual.  (¶80)

On June 27, 2022, the Plaintiff appealed the Faculty Committee Decision to affirm her termination,  to the SRU Board of Trustees.  (¶82)  The Board affirmed

17

her termination despite the fact that there was no persuasive or reliable evidence supporting her discharge. (¶83)

## SUMMARY OF ARGUMENT

The District Court erred in its dismissal of Plaintiff's claims at the 12(b)(6) stage of the proceedings on three basis, as described below.

- AS THE ISSUE OF DISCRIMINATORY TERMS AND CONDITIONS OF EMPLOYMENT INVOLVED FACTUAL QUESTIONS THAT COULD NOT BE RESOLVED AT THE DISMISSAL STAGE, THE DISTRICT ERRED IN GRANTING DEFENDANT'S 12(B)(6) MOTION
- THE DISTRICT COURT FURTHER ERRED IN DISMISSING THE COMPLAINT'S ALLEGATION THAT PLAINTIFF WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT
- THE DISTRICT FURTHER ERRED IN DISMISSING PLAINTIFF'S RETALIATION CLAIMS
- CONVERSION UNDER Fed.R.Civ. P. 129d)

## ARGUMENT

**I.    AS THE ISSUE OF DISCRIMINATORY TERMS AND CONDITIONS OF EMPLOYMENT INVOLVED FACTUAL QUESTIONS THAT COULD NOT BE RESOLVED AT THE DISMISSAL STAGE, THE DISTRICT ERRED IN GRANTING DEFENDANT'S 12(B)(6) MOTION**

The District Court erred in granting Defendant's Rule 12(b)(6) motion with respect to Plaintiff's Title VII, and Rhode Island state correlative, claims. The Verified Complaint plainly sets forth claims of gender, race sexual orientation, age and religion in violation of RICRA, FEPA, Title VII, Title IX and the ADEA.

18

4881-4565-5036, v. 2

### a. The Relevant Law

Applicable in this analysis is the Title VII *McDonnell Douglas Corp. v. Green* burden shifting analysis.  411 U.S. 792 (1973); see also *DeCamp v. Dollar Stores, Inc.*, 875 A.2d 13, 21-22 (R.I. 2005) (RICRA and FEPA); *Ing v. Tufts Univ.*, 81 F. 4th 77,82 (1st Cir. 2023)(Title IX); *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 446-47 (1st Cir. 2009)(ADEA).  Plaintiff's Verified Complaint sets forth more than sufficient averments in support of Plaintiff's contention that she was 1) a member of a protected class; 2) was qualified for her job (Plaintiff had tenure status); 3) that she suffered an adverse employment action (termination); and that 4) there was a causal connection between her membership in the protected class and the adverse employment action.  *Bhatti v. Trs. of Boston Univ.*, 659 F.3d, 70 (1st Cir. 2011)

### b. The District Court's determination that the Plaintiff's factual allegations did not yield a plausible claim that her membership in any of the submitted protracted classes played a role in her termination was clearly erroneous

As a threshold matter, at the early dismissal stage, the Court's function is to determine whether genuine issues of material fact exist, and not to decide those facts one way or another.  In this matter, the Court's consistent approach is to cite disputed facts and then resolve the issues that Plaintiff has clearly and properly pleaded, without exception, in favor of the Defendants.

19

4881-4565-5036, v. 2

For example, the Trial Judge states that the Plaintiff was "mired in workplace conflicts." (Page 3 of Memorandum & Order) That is a conclusory statement by the Trial Judge. The Plaintiff alleged that there existed a "protracted history or disagreements" with her department chairperson. (Complaint, ¶39) That allegation resulted in the Trial Judge's unwarranted conclusion as stated above. There is a vast difference between having a disagreement with her Department Chair and being "mired" in workplace conflicts as the Judge concluded.

The facts indicate that the Plaintiff's Department Chair made repeated attempts to undermine the Plaintiff by coordinating student protests and complaints against her which were characterized by aspersions on her protected characteristics. For example, this individual, as well as an unnamed University Provost, directed undergraduate students to "keep a running list of criticisms of the Plaintiff." (Complaint, ¶70) As the Complaint clearly articulates, these criticisms were rooted in Plaintiff's gender, sexual orientation/identification, age, religious beliefs and other protected characteristics, and formed the basis for the University's campaign to discipline and discharge the Plaintiff, *not* her behavior as a tenured faculty member.

In fact, the Trial Judge reiterated ad hominin attacks against the Plaintiff made by certain of her colleagues where she is labeled as being transphobic, homophobic, antisemitic and xenophobic. (Complaint, ¶112-113)

20

4881-4565-5036, v. 2

The Trial Judge seems to have concluded that these comments do not rise beyond the level of stray remark, while seemingly discounting the severity, regularity and extraordinary offensive nature of these comments. However, inexplicably, the Trial Judge remands these comments for state court review to determine the validity of Plaintiff's defamation claim. Because she has articulated them in her Complaint, these claims should be accorded the proper weight in implicating a discriminatory motive on the part of those in the university community. In other words, if there is any question that these comments are defamatory, as Plaintiff has properly alleged, it would be erroneous to simultaneously conclude that they cannot form the background for a hostile work environment; while at the same time referring them to state court for adjudication. In essence, the Judge is saying these comments are not bad enough to create a hostile work environment but remands the issue of their potential defamatory impact to the state court. There is no question that comments which amount to defamation would be sufficient to create a hostile work environment and are not merely stray remarks.

The facts implicate that the *male* department chairman encouraged students in Plaintiff's classes to undermine her with the University administration by making derogatory statements about her clearly premised on her protected characteristics. At this early stage, absent the benefit of any discovery, the Trial Judge cannot plausibly or reasonably make the determination that the Defendants' conduct was

21

4881-4565-5036, v. 2

*not* motivated by a discriminatory animus based on Plaintiff's protected characteristics. This case is in its infancy. It is error for the Trial Judge to conclude that statements initiated by her Department Chair were not part of an effort to undermine the Plaintiff, a tenured faculty member, on the basis of her gender, age, sexual orientation/identification, and religion. Nevertheless, the Trial Judge did so without affording the Parties any opportunity for discovery which presumably would have resolved these issues one way or another.

The Trial Judge reached these conclusions despite her stated reliance to a significant extent, on the   decision(s) by the University's Faculty Committee Hearing Board (Memorandum and Order. P.6), reading them as if incorporated into the Complaint. However, she went on to note, the position of the majority of the board that Plaintiff's termination was based on evidence that was collected prejudicially and that testimony against her was not solicited in an independent way. The majority opinion also rejected the University's attempt to include "sexual harassment" as a charge against Dr. Crawford, for which there is absolutely no evidence, as a reason for the Plaintiff's termination, without evidence that a Title IX investigation was ever conducted. (Memorandum and Order, P. 7, 9)

The Trial Judge disregards the Board's minority opinion which describes the Plaintiff's termination process as "prejudicial," asserting that evidence was collected from a **biased** sample of students and colleagues, that student feedback and other

22

objective performance measures were cherry picked to support dismissal and that the University did not substantively respond to evidence presented by the Plaintiff that "undercuts the legitimacy of their [the university's] charges." (Memorandum and Order, P. 8) The Board minority characterizes the administration's approach to the termination process as: "we need to dismiss [Plaintiff]; these are the categories available to us to do so; let us try to wedge [Plaintiff's] problems into these categories the best we can." (Memorandum and Order, P. 8)

It seems problematic that the Trial Judge could cite these obvious factual disputes between the parties and then proceed to resolve them in favor of a blanket dismissal of Plaintiff's claims.

### c. The Complaint plainly sets forth a Plausible Claim that Plaintiff's membership in a protected class played a role in her termination

Plaintiff's membership in several protected classes was the reason for the adverse employment actions suffered by Plaintiff. Taken in the light most favorable to the Plaintiff, the facts in this matter clearly provide the backdrop for a claim of discrimination based on protected characteristics.

The Trial Judge erred in prematurely granting the Defendants' Motion to Dismiss. Discrimination cases involve complex issues of intent, motive and credibility that cannot be easily resolved through the limited scope of a 12(b)(6) motion. Discrimination claims frequently rely on circumstantial evidence, and the determination of whether unlawful discrimination occurred requires a careful

23

examination of the facts, the context, and the motivations of the parties involved. Granting the Defendants' motion to dismiss the Plaintiff's claims prematurely denies the Plaintiff the ability to fully present her case, including any patterns of discriminatory behavior, and undermines the fundamental principle that such claims should be fully explored in a trial setting where evidence can be properly weighed.

### d. The Complaint plainly supports the allegation that Plaintiff was subject to disparate treatment

It is elemental that because "this appeal arises from the dismissal of the complaint for failure to state a claim, [this Honorable Court will] . . .draw the material facts from [the] complaint and the documents expressly referenced therein[,]" and that, "[i]n describing the facts, [this Honorable Court will] . . . indulge all reasonable inferences that fit [Plaintiff's] stated theory of liability." *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 12 (1st Cir. 2024) ("*Bazinet*"), *citing Banco Santander de P.R. v. Lopez—Stubbe (In re Colonial Mortg. Bankers Corp.)*, 324 F.3d 12, 15 (1st Cir. 2003) (internal quotation omitted).  This Court, that is, "[i]n evaluating the dismissal order, . . . [will] consider the facts as alleged in [Plaintiffs'] complaint and the content of documents . . . sufficiently referenced in the complaint[,]" (*Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th at 15, *quoting Bell Atl. Corp. v. Twomby*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

24

4881-4565-5036, v. 2

The Plaintiff's Complaint asserted significant factual support for her claims. Her allegations raise a right to relief above the level of mere possibility and make her claims more than just conceivable. It is Plaintiff's position (supported by the minority Board Decision 3-2 in favor of the Administration; Complaint ¶66) that her termination was unlawful. In fact, Plaintiff's Complaint raises significant facts to indicate that her termination was not based on legitimate considerations. Absent legitimate reasons, for which there is no record evidence, it is reasonably plausible that Plaintiff's termination was based on her protected characteristics and/or was motivated by improper considerations of those characteristics by the university and its agents. Plaintiff's evidence in support of this contention is more than speculative as she has averred detailed allegations of discriminatory comments and conduct which indicate that faculty and students, maliciously motivated by the university, harbored an animus towards her based on gender, age, sexual orientation/identification and religion.

## II.    THE DISTRICT COURT FURTHER ERRED IN DISMISSING THE COMPLAINT'S ALLEGATION THAT PLAINTIFF WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT

### a.   The Relevant Law

The Plaintiff alleged that the Defendants subjected her to an unlawful hostile work environment related to her gender, race, sexual orientation, age and religion in violation of RICRA, FEPA, Title VII, and the ADA. Each of these

25

4881-4565-5036, v. 2

statutes applied the same standard.  See *DeCamp*, 875 A.2d at 21-23 (RICRA and FEPA); *Franchina v. City of Providence*, 881 F.3d 32, 45 (1st Cir. 2018) (Title VII); *Rivera-Rivera v. Medina & Medina, Inc*., 898 F.3d 77, 91 (1st Cir. 2018)(ADEA).

A Plaintiff must show that 1) she is a member of a protected class; 2) she was subject to harassment; 3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; 5) the harassment was both objectively and subjectively offensive and 6) there exists some basis for employer liability to support a hostile work environment claim. *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 10 (1st Cir. 2015)

### b. Application of the Law to the assertions averred in Plaintiff's Complaint

The Trial Judge clearly erred in finding that the "totality of the alleged incidents" did not plausibly suggest the severe or pervasive harassment required to substantiate a hostile work environment claim.  (Memorandum and Order, P. 22) It appears from the Trial Judge's Memorandum and Order that she dilutes Plaintiff's allegations as merely creating a tense or uncomfortable working relationship with her supervisor.  This is a conclusory determination essentially taking for granted everything the Defendants assert as true, a clear inversion of the proper standard to be applied in these cases.

Furthermore, the Trial Judge states that the Court cannot "connect the dots between the plaintiff's protected characteristics and the Complaint's reported

26

4881-4565-5036, v. 2

intradepartmental machinations and backbiting." (Memorandum and Order, P. 22) It should be noted that the Court is characterizing Plaintiff's allegations of abuse in the workplace as "intradepartmental machinations and backbiting" when in fact, her lengthy Verified Complaint outlines a series of volatile comments and conduct based on her gender, race, sexual orientation/identification, age and religion.

The allegations in Plaintiff's Verified Complaint are not limited to a stray remark or offhand comment regarding her professional acumen. The conduct that she asserts clearly stems from considerations of her protected characteristics which created an untenable environment causing her extreme stress and humiliation. It is dubious how the Trial Judge could conclude that the Plaintiff's allegations of, *inter alia*, being called antisemitic, homophobic, a parasite, a racist, and the subject of baseless lies and aspersions on her character and professional abilities do not suggest the severe or pervasive harassment required to sustain a hostile work environment claim. It should be noted that the Plaintiff filed a Verified Complaint in this matter outlining her claims against the Defendants, including a statement under oath, affirming that the information is true. This verification adds credibility to the complaint and, in concert with the legal standard attendant to a 12(b)(6) motion to dismiss, all of Plaintiff's allegations should have been viewed by the Court in the light most favorable to her.

27

4881-4565-5036, v. 2

Plaintiff's verified factual assertions paint a picture of a deliberate effort by her white department chair, encouraged and manipulated by the university, to "take her down" and to solicit students and faculty in that effort.  It is not reasonable for the Trial Judge, without the benefit of discovery, to suggest that the comments and conduct asserted by the Plaintiff in her Complaint were mere offhand remarks and insufficient to support a hostile work environment claim especially in light of the discriminatory bias clearly emanating from the Defendants' offensive conduct.

Towards that end, Plaintiff directs the Court to her Complaint, ¶111, 112; 114 in which she outlines over 25  statements made by and/or elicited by authoritative university personal which were offensive in nature and/or shed the Plaintiff in a negative light based on her protected characteristics creating a hostile work environment.  These comments included but were not limited to accusing the Plaintiff of using offensive language and severely hateful rhetoric towards the LGBTQ+ community and people of color; accusing her of using a transgender slur; accusing her of making racist comments; calling her a parasite; inhumane and toxic.

Plaintiff denies the comments attributed to her and was deeply offended and hurt by the false and offensive statements.  At this stage, the Court has to perceive the facts in the light most favorable to the Plaintiff.  Therefore, it must conclude that the comments made by faculty and students were false, as asserted by the

28

Plaintiff. It is wholly improper to determine at this early stage that over 25 incidents of egregious name-calling; insults and false accusations towards the Plaintiff did not rise to the level of creating a hostile work environment. These are not simply "stray" comments as the Trial Court avers. These comments indicate a cumulative and egregious pattern of reprehensible conduct intended to interfere with Dr. Crawford's ability to perform her job functions. Plaintiff should not be denied the opportunity to engage in discovery to show, *inter alia,* the impact of these comments on her emotional well-being, her work environment and to probe the motivations of the Defendants through depositions and written discovery.

It is fully reasonable that a jury would conclude that these statements were severe, unreasonably interfered with the Plaintiff's ability to do her job and created a hostile work environment. Plaintiff's allegations are neither trivial nor isolated. The existence of a hostile work environment is determined in light of the "record as a whole" and with regard to the "totality of the circumstances." *Meritor Savings Bank, FSB vs. Vinson*, 477 U.S. 57, 69 (1986) A reasonable person in Plaintiff's position would likely find that these comments created a hostile work environment based on that totality of circumstances.

In the instant case, Plaintiff is a member of several protected classes based on her gender, race, sexual orientation, age and religion. Plaintiff's Verified Complaint adduced sufficient facts to establish that any harassment by the

29

4881-4565-5036, v. 2

Defendants was predicated on these characteristics.  Moreover, Plaintiff can establish through discovery that she was humiliated by the employers' treatment and that the alleged mistreatment unreasonably altered the terms and conditions of her employment--- resulting in her termination.

It should be noted that although there exists substantial evidence that Plaintiff suffered a severe impact causally related to her working conditions, it is well-settled that Title VII comes into play even before the harassing conduct leads to an extreme impact. A discriminatory and abusive work environment, even one that does not seriously effect employees' psychological well-being, can and often will detract from an employee's job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Caban v. Caribbean Transportation Services, et al*., 2005 U.S. Dist. LEXIS 38305, citing Susan E. Prince, Esq., *What Qualifies as Same-Sex Sexual Harassment Under Title VII: Legal and Practical Guidance*, 10 No. 1 (January/February 2004).

The comments and conduct reported by the Plaintiff in her Verified Complaint, take on the undeniable air of unlawful harassment in the overall context of combined incidents which, in the aggregate, come to constitute a pervasively hostile environment." *Pinkerton v. Colorado Department of Transportation*, 2009 U.S. App. LEXIS 7890 (April 16, 2009)

30

An environment is hostile when the workplace is permeated with intimidation, ridicule, demeaning comments, that are sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 126 L.Ed. 2d 295 (1993). Although reasonable minds might differ on the ultimate issue at trial, the Plaintiff's Verified Complaint is more than sufficient to allow a reasonable juror to conclude that Plaintiff suffered a frequent pattern of abusive behavior that altered her work environment. See Gen., *DeCamp v. Dollar Tree Stores, Inc*., 875 A.2d 13 (RI 2005). Indeed, she has asserted innumerous facts to show that the Defendants embarked on a deliberate mission to rally students and faculty in a concerted effort to shed her in both a false and negative light ultimately setting the backdrop for her termination as a tenured professor. These facts reinforce the conclusion that a reasonable trier of fact could find that the conduct to which Plaintiff was subjected was frequent, abusive, and substantially altered her work environment. Towards that end and in light of the totality of the circumstances, it is possible that a rational trier of fact could reach a reasonable conclusion that this conduct was both objectively and subjectively offensive. See Gen**.,** *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). See Gen**.** *Crowley v. L.L. Bean, Inc*., 303 F.3d 387 (2002)

31

### III. THE DISTRICT FURTHER ERRED IN DISMISSING PLAINTIFF'S RETALIATION CLAIMS

#### a. The Relevant Law

Title VII's anti-retaliation provision forbids discrimination against employees because they have opposed practices that are unlawful under Title VII. 42 U.S.C. § 2000e-3. To prevail on a retaliation claim, plaintiffs must prove three elements: (1) that they "engaged in protected activity; (2) that [they] suffered some materially adverse action; and (3) that the adverse action was causally linked to [the] protected activity." *Dixon v. Intl' Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007).

#### b. Application of the Law to the Assertions Averred in Plaintiff's Complaint

"[I]ndulging all reasonable inferences that fit [Plaintiff's] stated theory of liability" (*Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 12 (1st Cir. 2024)), the District Court should properly have determined that the Complaint sufficiently made out a case of retaliation under Title VII and Title IX.

With respect to the final element – that the adverse action was causally linked to the protected activity – the Complaint avers sufficient allegations supporting this element. Particularly, the Complaint set out that the employer took disciplinary action against the Plaintiff ultimately terminating her; the Defendants *pretextually claimed* that the Plaintiff had various performance deficiencies, when, in fact, *there was no basis* for such claimed misconduct, and such claim was manufactured merely

32

in response to the Plaintiff's good faith attempts to perform the duties of her position and was motivated by improper considerations of her protected characteristics.

### c. As the Complaint, then, contained sufficient averments to maintain a Title VII and Title IX cause of action, the District Court erred in granting the employer's Rule 12(b)(6) motion to dismiss the retaliation claim.

The Trial Judge erred in concluding that the Plaintiff engaged in no protected activity subjecting her to protection from retaliation. First, the Plaintiff does not hang her retaliation claims on the allegation that she was retaliated against because she sought to teach in an environment of free speech and academic freedom, as stated by the Trial Judge in the Memorandum and Order (P. 24). That oversimplifies the Plaintiff's argument. The employment practices of which Plaintiff complained, as clearly outlined in her Verified Complaint, is the conduct by the Employer in eliciting, condoning and encouraging faculty and staff to spew lies and hateful rhetoric towards the Plaintiff with impunity. The Trial Court's view that Plaintiff's retaliation claim is rooted in her desire for academic freedom oversimplifies and mischaracterizes the issue.

Plaintiff objected to conduct that was clearly geared by the university's discriminatory animus towards her which violated not one but several anti-discrimination statutes. Plaintiff's conduct in this regard makes her eligible for anti-retaliation protections.

4881-4565-5036, v. 2

Based on the facts asserted in Plaintiff's Verified Complaint, Plaintiff set forth sufficient assertions which support that she opposed conduct by the employer which potentially violated Title VII or Title IX. Furthermore, Plaintiff clearly participated in a prior matter regarding a grievance she filed against her department chair (Verified Complaint, ¶38,39) and she participated in the school's disciplinary process when the allegations against her arose. It is not unreasonable for the Plaintiff to assert that her defense of the baseless disciplinary action taken against her by the Defendants, which she argued was motivated by discriminatory animus in violation of several statutes, did not insulate her from retaliation. It is perfectly plausible for the Plaintiff to assert that the Defendants retaliated against her when she defended herself against baseless allegations and, as part of her defense, stated that the Defendants were improperly motivated by unlawful considerations of her protected characteristics.

Moreover, it should be noted that the Defendants took no steps to properly investigate this matter and the university's Title IX coordinator failed to conduct a full and proper Title IX investigation. (Verified Complaint, ¶45,46,48) The Defendants' Title IX investigator never even spoke to the Plaintiff as part of the investigation indicating a clear bias towards her and attempt to retaliate against her for initiating the Title IX process. The mere fact that any Title IX complaint was issued triggering an investigation, clearly subjects the Plaintiff to Title VII and Title

34

IX protection against retaliation.    It should be further noted that in response to the Title IX complaint initiating process, the university advanced a dubious and baseless allegation of "sexual harassment" against the Plaintiff, the nature of which could reasonably be perceived as retaliatory.

## IV.    Trial Court's Conversion under Fed. R. Civ. P. 12(d)

It is respectfully urged that the Trial Court aired in granting the motion to dismiss without converting it to a motion for summary judgment under FRCP 56 and allowing the Plaintiff a reasonable opportunity to submit other extraneous proofs to rebut the contention of the moving party, the Defendants.  The Plaintiff should have received notice of conversion and be given an opportunity to be heard as contemplated by Rule 56.  The Trial Court indicates that it had the discretion to consider the 12(b)(6) motion without converting it to one for summary judgment because it limited its consideration to basically two exhibits.    The Court contends that it limited its consideration of the exhibits attached to the Defendants' motion to dismiss to basically two documents—Faculty Manual excerpts and Faculty Committee Hearing Board majority and minority opinions.

However, even if the Court only considers these limited documents, these documents clearly implicate a significant factual dispute as to the Defendants' discriminatory motive, one that could never be resolved by the Rule 12(b)(6) standard.  It was error for the Trial Court not to convert Defendants' motion for one

35

for Rule 56 summary judgment, and require that the Defendants submit a narrative summary of what they contend to undisputed material facts. The Rule 56 strictures regarding notice hearing and admissibility of evidence are strictly required pursuant to a Rule 56 motion for summary judgment. The Trial Court in this matter, in what might be argued as an effort to prevent the Plaintiff from engaging in discovery, has simply compressed Plaintiff's numerous factual allegations in to a general finding that her case does not contain sufficient factual allegations without the benefit of the slightest effort towards discovery. In doing so, the Trial Court has denied the Plaintiff the opportunity to clarify how the facts alleged in the Complaint clearly establish discriminatory conduct on the part of the Plaintiffs.

In support of its motion to dismiss, the Defendants attached approximately 10 exhibits, comprising approximately 125 additional pages of alleged evidence, in support of its arguments for dismissal. Fed. R. Civ. P. 12(d) states that: if, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion *must* [emphasis added] be treated as one for summary judgment under Rule 56 and "*All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.*" (Emphasis added.) Simply adding reams of material to a 12(b)(6) motion is not a valid means to avoid the requirements of a Rule 56 motion for summary judgment. All parties **shall** be given the reasonable opportunity to present all material made pertinent to

36

such a motion by Rule 56.  See *Reliance Ins. Co. v. City of Boston*, 71 Mass. App. Ct. 550,555 (2008) ("Where the failure to provide such an opportunity results in prejudice to a party, such a failure can constitute reversible error.")

When a defendant submits exhibits in support of a 12(b)(6) motion, and the motion is not converted to a summary judgment motion, the process directly contravenes the plain and clear text of FRCP 12(d).  Rule 56 is central to understanding 12(d) because it distinguishes the factual material presented in a summary judgment motion from those presented in a 12(b)(6) motion.  When the court evaluates materials presented at the summary judgment stage, Rule 56 specifies the standard in connection to evidence admissibility.  When materials are presented at the 12(b)(6) stage it is unclear how they should be evaluated.  This uncertainty further justifies 12(d)'s mandate to either exclude the materials in question or conversion to a summary judgment motion.

Towards that end, it should be noted that in support of its 12(b)(6) motion, the Defendants attached, *inter alia*, purported "student complaints" against the Plaintiff and other documents that may not be admissible at trial, for the various reasons stated above, including but limited to the fact that these documents are wholly unauthenticated.  For example, contained in Defendants' Exhibit 5 of the external documents, are approximately 9 communications, alleged by Salve to have been drafted by students and faculty.  In all cases, but  one from a faculty

37

member, these statements are unsigned, undated, unverified, unauthenticated. Obviously, Plaintiff has not had the opportunity to confront these alleged complainers at this early stage. In fact, to whatever extent these documents are credited after full discovery, it is instructed that each of the alleged student statements were drafted *after* a meeting engineered by the Department Chair and apparently at his instruction just as Plaintiff alleged.

To the extent that the Court reviewed these exhibits or took "judicial notice" of them in the context of its review pursuant to 12(b)(6), it is respectfully urged that nothing contained in the statements should be considered for the truth of the matters asserted. The Plaintiff has had no opportunity to probe the complainants, many of which have not ever been identified by the university. However, the facts as alleged by Plaintiff (and therefore taken as true) are clear that these derogatory statements emanated from the Defendants or agents under their control and direction. The Trial Court states essentially that it did not consider these exhibits supplied by defendants, but the statements at issue are in the Complaint.

Again, no discovery has been conducted in this matter, and if such material is to be considered by the Court, the Plaintiff cannot be denied a full and fair opportunity to probe the veracity and relevance of such material, by way of written discovery and deposition testimony. Because this case is in its infancy, none of this has occurred as no discovery has been conducted, discovery which the Plaintiff

38

4881-4565-5036, v. 2

respectfully urges is crucial to clarifying and developing the underlying facts of this dispute in order to accomplish a fair adjudication.  Notably, in the context of a review under the summary judgment standard, it goes without saying that Defendants' recitation of "facts" interspersed throughout its argument in no way comports with court rules that a valid motion for summary judgment must be supported by a statement of undisputed material facts, citing to the record.

Towards that end, there is a narrow swath of materials outside the complaint itself that may be considered on a motion to dismiss for failure to state a claim, without converting the claim to one for summary judgment.  See, e.g., *Freeman v. Town of Hudson*,714 F.3d 29, 36 (1st Cir. 2013.)  The court may consider documents incorporated by reference in the complaint, matters of public record, and matters susceptible to judicial notice.  *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 17 (1st Cir. 1998).  The documents presented by the Defendants in support of Defendants' 12(b)(6) motion (as referenced further, below) are, for the most part, outside of the criteria specified above. Though some documents are arguably incorporated in the Complaint – i.e., the employee manual and decision/dissent of the faculty board – other documents the defendants attempt to submit are clearly not a matters of public record or matters susceptible to judicial notice, and would only be potentially admissible, if at all, in support of a summary

39

judgment motion, after discovery. Clearly, the documents the Trial Court concedes it has reviewed support the Plaintiff's position that a factual conflict exists.

It is well established that 12(b)(6) motions are viewed through the lens that all of Plaintiff's allegations are accepted as true. Rule 12(b)(6) motions are rarely granted and are not generally favored. These motions challenge the sufficiency of the Complaint on its face and should only be granted if the allegations are defective as a matter of law. That is clearly not the case in the instant matter as plaintiff's allegations more than meet her burden at this early juncture, and the Trial Court's repeated use of demeaning terms such as "threadbare" do not change that fact.

A decision by the United States District Court for the District of Maine illuminates the critical distinction between a determination on a motion to dismiss and on a motion for summary judgment, or one later in litigation—particularly in a case involving allegations of discrimination *Bodman v. Me., Dep't of HHS*, 720 F. Supp. 2d 115, 119 (D. Me. 2010). In *Bodman,* the Defendant Department filed a motion seeking early dismissal of the plaintiff's complaint. (See also *Forrest v. Brinker International Payroll Co.*, 511 F.3d 225 (1st Cir. 2007). The District Court denied the Department's motion, emphasizing the importance of the parties having the opportunity to engage in discovery and to present a complete factual record. Id. at 12.

40

4881-4565-5036, v. 2

The analysis in *Bodman* offers a useful paradigm through which to view Plaintiff's allegations at this stage. Viewing the facts alleged in the Plaintiff's Complaint as true and plausible, Plaintiff has met her burden under the 12(b)(6) standard. The development of the record at this stage is a factor, just as it was for the *Bodman* court. In the case at bar, the parties have not undertaken any discovery, and cannot know at this early stage the probative value of relevant evidence.

It is unfair and inappropriate for the Defendants to disguise an argument for summary judgment under the shroud of a 12(b)(6) motion. Essentially, the Defendants have improperly smothered the court with a forest of disputed "facts" and potentially inadmissible material, in the hope that the court will sever a branch here and there. Respectfully, that is not the purpose of a Rule 12(b)(6) motion.

## CONCLUSION

"In determining whether a complaint crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense." *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013)(quoting *Aschcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Assessing whether the claim to relief is plausible is a "context-specific inquiry [that] does not demand a 'high

degree of factual specificity." Id. (quoting *Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40,47 (1st Cir. 2012))

The Plaintiff's Verified Complaint asserted more than enough factual allegations upon which dismissal at this early stage was in error. Without the benefit of discovery, the Trial Judge could not reasonably conclude that Plaintiff's allegations, taken in the light more favorable to her, were insufficient.

Plaintiff respectfully requests that this Honorable Court reverse the District Court's granting of the Defendant's Rule 12(b)(6) motion, and remand the case for further proceedings.

*/s/ Stephen T. Fanning*

_____

STEPHEN T. FANNING (RI #3900)
305 South Main Street
Providence, RI 02903
(401) 272-8250
Stephenfanning@msn.com
March 13, 2025

CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 10365 words, not including its exempted portions. The brief has been prepared monospaced typeface using Times New Roman, 14 Point Font. As permitted by Fed. R. App. P. 32(a)(5) (B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

4881-4565-5036, v. 2

Signed this 13th day of March 2025,

*/s/ Stephen T. Fanning*

CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Plaintiff-Appellants with the Clerk of the United States Court of Appeals for the First Circuit via the CM/ECF system this 13th day of March 2025 to be served on the following counsel of record for Defendants via ECF:

Joseph Whelan, Esq.
Matthew Parker, Esq.
Whelan, Corrente & Flanders, LLP
100 Westminster Street, Suite 710
Providence, RI 02903

Signed this 13th day of March 2025

*/s/ Stephen T. Fanning*

43

4881-4565-5036, v. 2

No. 24-1656

United States Court of Appeals
For the First Circuit

LINDA CRAWFORD

*Plaintiff-Appellant,*

*v.*

SALVE REGINA UNIVERISTY; SALVE REGINA UNIVERSITY BOARD OF
TRUSTEES, through its President, Dr. Kellie J. Armstrong; JAMES G.
MITCHELL, Chair, SRU Department of Modern Languages and President, Salve
Regina AAUP CCHP; ESTHER ALARCON-ARANA, Faculty, SRU Department
of Modern Languages; EMILY COLBERT-CAIRNS, Faculty, SRU Department of
Modern Languages,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Rhode Island
in Case No. 1:23-cv-00380-MSM, Judge Mary McElroy

**ADDENDUM TO BRIEF OF APPELLANT LINDA CRAWFORD**

STEPHEN T. FANNING
305 South Main Street
Providence, RI 02903
(401) 272-8250
Stephenfanning@msn.com
March 13, 2025

## TABLE OF CONTENTS

MEMORANDUM AND ORDER.............................................................. 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| LINDA CRAWFORD,<br>    Plaintiff,<br><br>    v.<br><br>SALVE REGINA UNIVERSITY (SRU),<br>SALVE REGINA UNIVERSITY<br>BOARD OF TRUSTEES through its<br>President DR. KELLIE J.<br>ARMSTRONG; JAMES G.<br>MITCHELL, Chair SRU Department<br>of Modern Languages and President,<br>Salve Regina AAUP Chp.; ESTHER<br>ALARCON-ARANA, Faculty, SRU<br>Dept. of Modern Languages; and<br>EMILY COLBERT-CAIRNS, Faculty,<br>SRU Dept. of Modern Languages,<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 1:23-CV-00380-MSM-PAS |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Before the Court is a Motion to Dismiss all counts of plaintiff Linda Crawford's Complaint (ECF No. 11), brought by defendants Salve Regina University ("the University"); the University's Board of Trustees through its President, Dr. Kellie J. Armstrong; and James G. Mitchell, Esther Alarcon-Arana, and Emily Colbert-Cairns, the plaintiff's former colleagues in the University's Modern Languages Department. The plaintiff alleges breach of contract, various torts, and violations of state and federal anti-discrimination law related to the University's termination of her employment as a tenured professor.

1

The plaintiff originally filed her complaint in Rhode Island Superior Court. (ECF No. 1-1.) The defendants removed the case on the basis of federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. (ECF No. 1.) The plaintiff objects to defendants' Motion to Dismiss and further argues that because defendants appended purportedly extraneous factual material as exhibits, it should be converted to a motion for summary judgment per Fed. R. Civ. P. 12(d). (ECF No. 16.)

For the following reasons, the defendants' motion is GRANTED as to all the plaintiff's federal and state anti-discrimination claims (Counts V-IX). Absent federal court jurisdiction over any of the surviving claims, and because this case remains in its early stages, this Court declines to exercise supplemental jurisdiction over the plaintiff's remaining state-law contract and tort claims.

## I.    BACKGROUND

As required on a motion to dismiss, the Court must accept the Complaint's well-pled facts as true and discard its conclusory assertions and legal conclusions. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013).

At the time of her termination in January 2022, the plaintiff was a tenured professor of Spanish in the University's Modern Languages Department, a position she had held since 2004. (ECF No. 1-1 ¶ 15.) The plaintiff "maintained a positive record of employment" as a professor, with her "evaluations over the last several years" showing "no negative trends in her performance or deviations [from] her adherence to her teaching responsibilities." *Id.* ¶ 16. Moreover, her employment

record "is devoid of contemporaneous[ly] documented misconduct of any kind." *Id.* ¶18.

Unfortunately, however, the plaintiff was mired in various workplace conflicts. She alleges a "protracted history of disagreements" with her department chairperson, James G. Mitchell, against whom she had previously filed a grievance. *Id.* ¶ 39. Letters to the University from her Modern Languages colleagues Esther Alarcon-Arana and Emily Colbert-Cairns provide additional, vivid evidence of the tension within the department; per the Complaint, her fellow faculty members inveighed that plaintiff's "focus was to undermine the modern languages department," that she "bad[-]mouthed male colleagues," that she made transphobic, homophobic, antisemitic, and xenophobic comments, that she was a "parasite" and a "toxic person," and that she "'sewed acrimony' among students, faculty, and staff." *Id.* ¶¶ 112-13. A faculty committee hearing board opinion affirming the plaintiff's termination similarly cited "[i]ssues in the modern language[s] department" that had "been long[-]standing" and had gone "largely ignored by previous administration[s] and human resources." *Id.* ¶ 65.

In the plaintiff's telling, this intradepartmental ill-feeling came to a head in the Fall 2021 semester and led to her termination. The plaintiff alleges that, at the beginning of the semester, Mitchell and an unnamed University provost directed the plaintiff's undergraduate students to "keep a running list of criticisms" of the plaintiff. *Id.* ¶ 70. Then, in a November 2021 meeting of the plaintiff's course on Latin American Culture, a student identified as "Student D" "had an outburst in

class." *Id.* ¶ 27. Student D was "upset because Plaintiff, who he described as a 'cis White woman,' used a reading that contained the word 'trans[vestites].'"[1] *Id.*

After that class, Student D and others met with Mitchell in his office, at Mitchell's invitation. *Id.* ¶ 37. During that meeting, Michell "encouraged and/or directed the students to submit written statements to the university criticizing" the plaintiff, purportedly in "an effort to retaliate against" her. *Id.* ¶¶ 39-40.

The next day, Student D emailed a University provost, asking the administration to "take action" against the plaintiff, who he described as "ignorant." *Id.* ¶¶ 29, 33. According to the Complaint, Student D's email recounted "that he [had] informed" the plaintiff that, because plaintiff "is a white straight cis woman, … she cannot tell [him] what" he, as "a transgender gay man," "find[s] offensive.'" *Id.* ¶ 31. Student D stated that Mitchell had advised him to submit "a formal complaint" about the plaintiff's actions. *Id.* ¶ 29.

Another student, "Student C," wrote, "that he was 'directed by an advisor,'" who the plaintiff identifies as Mitchell, to email the provost about "derogatory language regarding transgender people in Plaintiff's class." *Id.* ¶ 34. Student C reported that he "found the language at issue to be 'triggering'" and opined that "the classroom should be a 'warm and safe space.'" *Id.*

---

[1] While the Complaint states that Student D objected to Crawford's use of a reading that included the term "transgender," this appears to be a typographical error. A preceding paragraph implies that the disputed term was "transvestites." (ECF No. 1-1 ¶ 24.) Moreover, in an email written by Student D about plaintiff, he described himself as a "transgender gay man." *Id.* ¶ 31.

The plaintiff cites the student complaints' similar "tone and content" as "indicating that they were the product of a deliberately coordinated effort." *Id.* ¶ 42. She also characterizes "certain students" as "[taking] the position that [she] had no right to teach about certain cultural norms in Latin America because she was [a] 'cis white woman.'" *Id.* ¶ 71.

The University later held a Zoom meeting, without the plaintiff, for the plaintiff's students. *Id.* ¶ 43. Reportedly, certain students "described Plaintiff as using 'offensive language and hateful rhetoric' towards the L[GB]QT+ community and people of color." *Id.* ¶ 44. The plaintiff claims that she was not given an opportunity to contest these claims before her termination. *Id.*

Approximately a week after that class, the University's Title IX coordinator emailed plaintiff a "Notice of Interim Action." *Id.* ¶¶ 47-48. He stated that students "alleged that the Plaintiff made comments that were derogatory toward 'a population based on that population['s] ... gender identity or expression'" and that students who were members of the "Spanish Club" "expressed that they 'do not feel safe around'" the plaintiff. *Id.* ¶ 48. The coordinator stated, however, that the email should "not be construed to indicate that the university has taken any disciplinary [action] against" her. *Id.*

On January 3, 2022, the University notified the plaintiff that she had been terminated for cause, citing "continued misconduct," "failure to communicate," and "failure to comply with the requirements of a faculty member in accordance with the Faculty Manual." *Id.* ¶ 17. Per the plaintiff, the University's President described the

November 2021 class as the "catalyst" for plaintiff's termination but claimed that the "past seven years" of her employment had been "'fraught' with misconduct in the classroom and unacceptable teaching practices." *Id.* ¶ 23. The plaintiff alleges that, after her termination, the University "replaced [her] with respect to at least part of her teaching schedule with a male significantly younger than [her] who is believed to be the husband of Defendant Alarcon-Arana." *Id.* ¶ 73.

The plaintiff "was the first and only tenured full professor subject to termination proceedings" at the University. *Id.* ¶ 79. She asserts that other faculty members were "treated with far greater deference ... in the face of more serious accusations," invoking an unnamed "male administrator of the Modern Languages Department [who] was involved in a concerning legal matter" but was "allowed ... to 'step down' from his position and [was] awarded ... full tenure, two sabbaticals and several course reductions." *Id.* ¶ 78. The minority opinion of the faculty committee hearing board that reviewed her dismissal appears to reference the same individual, stating that "one of [the plaintiff's] colleagues ... continues in their position even though some years ago, this person could have justifiably been 'fired for cause' on grounds that were publicly known" in "newspaper stories and police reports." (ECF No. 11-8 at 12.)

The plaintiff appealed her termination to the University's faculty committee hearing board. (ECF No. 1-1 ¶ 54.) As discussed further below, the Court reads the hearing board's report, including the majority and minority opinions, as though it was incorporated into the Complaint. *See Foley v. Wells Fargo Bank, N.A.*, 772 F.3d

63, 74 (1st Cir. 2014) (noting that, on a Rule 12(b)(6) motion, courts may consider certain documents not attached to the complaint falling into one or more identified "narrow exceptions" (quoting *Watterson v. Page*, 978 F.2d 1, 3 (1st Cir. 1993))). The hearing board voted three to two to affirm the plaintiff's termination. (ECF No. 11-8 at 3.)

At the review hearing, the bases presented by the University to support the plaintiff's dismissal were misconduct ("including sexual harassment"), abandonment, incompetence, and "[f]ailure to meet or comply with the terms and conditions of her employment." *Id.* at 2.

The majority opinion found that the University had presented sufficient evidence that the plaintiff "regularly and routinely uses derogatory language that minimizes others and promotes hurtful stereotypes" and "shows regular patterns of abandonment in her teaching or interaction with students." *Id.* at 5. It rejected the claim that she "operated to undermine her colleagues' academic credentials" while previously serving as department chair as insufficiently substantiated, as well as "hearsay" allegations that the plaintiff "engages in conversations with students about the ethnicity or religious beliefs of her colleagues." *Id.*

The majority also expressed its belief that the plaintiff's termination "was based on evidence that … was collected prejudicially." *Id.* It cited the "addition of two more reasons for dismissal" by the University after plaintiff had already been terminated, testimony that "was not solicited in an independent way," and the inclusion of sexual harassment as a reason for dismissal when it was "unclear"

whether a Title IX investigation was ever conducted. *Id.* at 6. It opined that this "bias in the evidence collection process does not appear to be a complete function of prejudice against the [plaintiff,]" but "rather … a product of an ill-conceived dismissal procedure that is greatly out of date with current practices." *Id.* at 5.

Like the majority, the minority opinion described the plaintiff's termination process as "prejudicial." *Id.* at 8. It posited that evidence was collected from a biased sample of students and colleagues, that student feedback and other objective performance measures were cherrypicked to support dismissal, that the class discussion incident was unfairly "characterized as a one-way, unilateral failure on the part of the professor, with no critical exploration of student reactions to" the controversial article, which it described as "eminently 'teachable,'" and that the university did not substantively respond to evidence presented by the plaintiff that "undercuts the legitimacy of their charges." *Id.* at 9-11. It characterized the administration's approach to the termination process as: "we need to dismiss [plaintiff]; these are the categories available to us to do so; let us try to wedge [plaintiff's] problems into these categories as best we can." *Id.* at 9.

The minority opinion opined that the plaintiff's termination was, in actuality, motivated by the University's belief that "number and scope of 'unworkable' relationships" between the plaintiff "and others in the community" had become "so problematic" that her "continued presence" had "reach[ed] a generally dysfunctional status." *Id.* at 8. The opinion described the plaintiff as having "had a pattern of relationship problems over the years with every level of the university—with some

students, the majority of her faculty colleagues in the Modern Languages department, and the entirety of the present undergraduate academic affairs administration (from Undergraduate Dean to Provost to President)." *Id.* That the plaintiff was "continually in the middle" of "wide-ranging tension, even conflict, with various members of the Salve community" was not, in its view, "by itself an indication of fault on her part in every instance," but still "pose[d] a problem for the institution." *Id.* It submitted, however, that dismissal was the "wrong tool for solving the problem" of the "difficult and complex personnel issue" posed by the plaintiff, and that "[o]ther remedies, more creative and constructive, should be explored" instead. *Id.* at 12.

The plaintiff appealed the hearing board's decision to the University's Board of Trustees, which affirmed her dismissal. (ECF No. 1-1 ¶¶ 82-83.) She then filed this action in Rhode Island Superior Court.

Additionally, to support her age discrimination claim, the plaintiff asserts that unidentified individuals referred to her and another senior faculty member "as 'old school' because of their request that students use their titles and not their first names"; told a student "that she may want a different advisor … who was capable of 'fresh ideas and perspectives'"; and "criticized" her "for not using gender neutral endings in Spanish and told [her that] this was because she was 'older.'" *Id.* ¶ 74.

## II.    MOTION TO DISMISS STANDARD

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states

9

a claim for which relief can be granted." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011).

The Court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *A.G. ex rel. Maddox*, 732 F.3d at 80. It "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint." *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)). It need not credit the complaint's "conclusory statements" and allegations that, "though disguised as factual, are so threadbare that they omit any meaningful factual content." *Id.* at 81.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "If the factual allegations in a complaint, stripped of conclusory legal allegations, raise no 'more than a sheer possibility that a defendant has acted unlawfully,' the complaint should be dismissed." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 270 (1st Cir. 2022) (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "[A]ssessing plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Rodríguez-Reyes*, 711 F.3d at 53).

## III.    DISCUSSION

### A. Conversion under Fed. R. Civ. P. 12(d)

The defendants' Motion to Dismiss includes ten exhibits. (ECF Nos. 11-1 through 11-10.) The plaintiff argues that, under Fed. R. Civ. P. 12(d), the Court must either exclude the materials in question or convert the motion to dismiss to a motion for summary judgment.

Rule 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) ... matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "[N]o conversion occurs," however, where a district court, in its discretion, "chooses to ignore the supplementary materials and determines the motion under the Rule 12(b)(6) standard." *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 18 (1st Cir. 1992). Furthermore, district courts may consider, without converting a Rule 12(b)(6) motion into one for summary judgment, "documents that were not attached to the complaint" falling into certain "narrow exceptions," including "documents the authenticity of which are not disputed by the parties; ... documents central to [plaintiff's] claim; or ... documents sufficiently referred to in the complaint." *Foley*, 772 F.3d at 74 (quoting *Watterson*, 987 F.2d at 3).

The Court limits its consideration of the Motion to Dismiss exhibits to the faculty manual excerpts and faculty committee hearing board report, including the majority and minority opinions. (ECF Nos. 11-1, 11-8.) The Court may do so because the plaintiff does not dispute the authenticity of these two documents; indeed, she

11

concedes that they are "arguably incorporated into the Complaint." (ECF No. 16-1 at 19.) *See Foley*, 772 F.3d at 74. The hearing board report is also "sufficiently referred to in the complaint" to be cognizable on a Rule 12(b)(6) motion. *Id.* The Complaint quotes the minority and majority opinions, the latter at some length, to support the plaintiff's disparate treatment claim. (ECF No. 1-1 ¶¶ 65-66, 69.)

The Court is also satisfied that the plaintiff had actual notice of the contents of both documents. *See Watterson*, 987 F.2d at 4 ("The problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff"; "[w]here plaintiff has actual notice" of their contents, the "necessity" to convert the motion "is largely dissipated." (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992)) (brackets omitted)).

## B. Anti-Discrimination Claims

The plaintiff's anti-discrimination claims are brought pursuant to five statutes: the Rhode Island Civil Rights Act ("RICRA"), R.I.G.L. § 42-112-1 *et seq.* (Count V); the Rhode Island Fair Employment Practices Act ("FEPA"), R.I.G.L. § 28-5-1 *et seq.* (Count VI); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.* (Count VII); Title IX of the Education Amendments of 1972 ("Title IX"), § 20 U.S.C. 1681 *et seq.* (Count VIII); and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count IX).

The plaintiff asserts that the University and Board of Trustees (the institutional defendants) discriminated against her on the bases of her gender

(Counts V, VI, VII, and VIII); race and color (Counts V, VI, and VII); sexual orientation (Counts V, VI, and VII); age (Counts V, VI, and IX); and religion (Counts V and VI).

### 1. Discriminatory terms of employment

The plaintiff alleges that the institutional defendants subjected her to discriminatory terms of employment based on her gender, race, sexual orientation, age, and religion in violation of RICRA, FEPA, Title VII, Title IX, and the ADEA.

Each statute approaches disparate treatment claims that are based on circumstantial evidence, such as those in this case, using the familiar Title VII *McDonnell Douglas Corp. v. Green* burden-shifting analysis. 411 U.S. 792 (1973); *see also DeCamp v. Dollar Tree Stores, Inc.*, 875 A.2d 13, 21-22 (R.I. 2005) (RICRA and FEPA); *Ing v. Tufts Univ.*, 81 F.4th 77, 82 (1st Cir. 2023) (Title IX); *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 446-47 (1st Cir. 2009) (ADEA).

A prima facie case "presents a four-part test: (1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action." *Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 70 (1st Cir. 2011).

The prima facie elements form "part of the background against which a plausibility determination should be made," and "may be used as a prism to shed light upon the plausibility of a claim." *Rodríguez-Reyes*, 711 F.3d at 54. But the "prima

13

facie standard is an evidentiary standard, not a pleading" one. *Id.* The dispositive test is not whether the plaintiff has presented the elements of a prima facie case, but whether the complaint "contain[s] facts that 'plausibly allege' that the plaintiff experienced a discriminatory employment action." *Frith*, 38 F.4th at 271 (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).

The plaintiff has adequately alleged that she is a member of all submitted protected classes, that she was qualified for her job, and that she suffered an adverse employment action in the form of her termination. She fails, however, to plausibly allege that her protected characteristics had any "causal connection" to her dismissal. *Bhatti*, 659 F.3d at 70. She has thus failed to state a claim of disparate treatment.

The plaintiff asserts but fails to provide well-pled facts to plausibly allege that others outside of her protected class(es) were given preferential treatment by the University. A causal connection between a plaintiff's protected characteristics and an adverse employment action may be supported by evidence that similarly situated individuals outside the plaintiff's protected class were treated more favorably. *See, e.g.*, *Diaz v. City of Somerville*, 59 F.4th 24, 32 (1st Cir. 2023).

The plaintiff alleges that she is the only tenured full professor to have been formally terminated, and that a male administrator in her department was not subject to such proceedings despite having been "involved in a concerning legal matter." (ECF No. 1-1 ¶¶ 78-79.) The faculty committee hearing board minority opinion similarly invokes "one of [the plaintiff's] colleagues" who "could have

14

justifiably been 'fired for cause' on grounds that were publicly known (newspaper stories and police reports)." (ECF No. 11-8 at 12.)

"[W]hile the plaintiff's case and the comparison cases that [she] advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." *Diaz*, 59 F.4th at 32 (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999)). Here, one obviously relevant circumstance would be the nature of the "concerning legal matter," which the Court cannot divine from innuendo. The plaintiff's and hearing board's allusions are too vague to allow for a reasonable inference that the unnamed faculty member is a similarly situated comparator.

Next, that a significantly younger male of unspecified race and sexual orientation replaced the plaintiff with respect to at least part of her courseload may be relevant to a prima facie case under *McDonnell Douglas*. *See, e.g.*, *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93 (1st Cir. 2012) (noting that one way to meet the fourth element of a prima facie case is to show that the position "was filled by a person with similar qualifications" (quoting *Kosereis v. Rhode Island*, 311 F.3d 207, 212-13 (1st Cir. 2003))). *But see LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 846 (1st Cir. 1993) ("[A] discharged employee 'is not replaced'" for purposes of a prima facie case "when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1457 (6th Cir. 1990))).

15

When considering whether the plaintiff has stated a plausible claim of disparate treatment, however, her replacement with a younger male does little to support a reasonable inference that her protected characteristics played a role in her termination. *See Reilly v. Cox Enters., Inc.*, C.A. No. 13-785S, 2014 WL 4473772, at *8 (D.R.I. Apr. 16, 2014) (finding that plaintiff's having been "replaced by a younger man" was "insufficient to support a plausible inference of age or gender discrimination") (citing *Han v. Univ. of Dayton*, 541 F.App'x 622, 627 (6th Cir. 2013)), *adopted*, No. 13-785S, by Order of July 30, 2014.

The plaintiff's proffered evidence of protected class-based animus is similarly unhelpful. The comments excerpted from her colleagues' letters to the University, describing the plaintiff as a "parasite," a "toxic person," and "sew[ing] acrimony," while likely offensive and unpleasant, are neutral as to all submitted protected characteristics. (ECF No. 1-1 ¶¶ 112-113.) *Cf. Morales-Cruz*, 676 F.3d at 225 ("unflattering" but "gender-neutral" descriptions of the plaintiff as "fragile" and "immature" did not support an inference of gender stereotyping). Rather, other than her age-discrimination claim, the plaintiff appears to put all her eggs in one basket: Student D's describing plaintiff as a "white straight cis woman" and a "cis White woman."

The value of Student D's two statements to the plaintiff's disparate treatment claim is limited by his status as a "nondecisionmaker" and by the fact that his statements, despite referencing the plaintiff's race, gender, and sexual orientation, appear to be facially inoffensive "stray remarks." *See Gonzalez v. El Dia, Inc.*, 304

F.3d 63, 69 (1st Cir. 2002) ("'[S]tray workplace remarks,' as well as statements made ... by nondecisionmakers ... normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.").

More critically, "assessing plausibility is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Frith*, 38 F.4th at 275 (quoting *Rodríguez-Reyes*, 711 F.3d at 53). Even in the elliptical form in which they are presented in the Complaint,[2] common sense leads the Court to read Student D's statements describing the plaintiff as a straight, white, cisgender woman as part of his explanation, first to the plaintiff and then to the provost, of why he was offended by the plaintiff's use of the term "trans[vestite]" and by her purported attempt to "tell [him] what" he, as "a transgender gay man," should "find offensive.'" (ECF No. 1-1 ¶¶ 27, 31.) The Court need not infer invidious discrimination when faced with an "obvious alternative explanation" for the conduct at issue. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567); *see also Frith*, 38 F.4th at 275 (relying on "[c]ommon sense" explanation of employer's allegedly discriminatory action to affirm dismissal).

The plaintiff's characterization of "certain students" as "[taking] the position that [she] had no right to teach about certain cultural norms in Latin America

---

[2] The relevant allegations are as follows:

"During the class in question," Student D "appeared to become upset because Plaintiff, who he described as a 'cis White woman,' used a reading that contained the word 'trans[vestite].'" (ECF No. 1-1 ¶ 27.)

"[Student D] states that he informed the Plaintiff that he was a 'transgender gay man' and she [Plaintiff] is a white straight cis woman, so she cannot tell me [Student D] what I [Student D] find offensive." *Id.* ¶ 31.

17

because she [is] [a] 'cis white woman'" (ECF No. 1-1 ¶ 71), appears to be an unsupported, subjective interpretation of the students' statements, which the Court need not credit, rather than a well-pled factual allegation, which the Court would accept. The Court need not credit a complaint's "unsupportable conclusions," *In re Ames*, 993 F.3d 27, 35 n.3 (1st Cir. 2021) (quoting *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)), nor "speculation, unaccompanied by any factual predicate," which cannot "confer plausibility" on a complaint. *Morales-Cruz*, 676 F.3d at 225.

As for the comments relied on to support plaintiff's age-based disparate treatment claim, the plaintiff provides no information about the speakers or when the comments were made. (ECF No. 1-1 ¶ 74.) These unmoored statements cannot support a reasonable inference between any potential age-based animus and the plaintiff's termination.

The submitted procedural irregularities in the University's dismissal process similarly fail to "'nudge[] [plaintiff's] claims' of invidious discrimination 'across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570). In the context of student discipline, the First Circuit has noted that "procedural irregularities" in due process procedures "may be relevant in identifying" discrimination. *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 334 (1st Cir. 2022). But "procedural errors are not inevitably a sign of [protected class-based] bias" or that the plaintiff has stated a plausible claim of discrimination. *Id.* On a motion to dismiss a claim of disparate treatment founded on procedural-irregularity evidence, "[t]he challenge is to distinguish between proceedings plausibly affected by [illegal] bias"

18

and "proceedings whose alleged flaws are not attributable to sex bias," but "other plausible reasons" such as "ineptitude, inexperience," and even "bias" that is nevertheless "[protected class]-neutral." *Id.* (quoting *Doe v. Samford Univ.*, 29 F.4th 675, 692 (11th Cir. 2022)).

Many of the identified faults in the plaintiff's termination process do not contribute to an inference that her termination was procedurally irregular or otherwise involved a discriminatory motive. Many of the University's actions are either not alleged to have violated an internal rule or the faculty manual (ECF No. 1-1 ¶¶ 20, 43, 44, 48, 54, 62) or are presented as part of a broader argument that the faculty manual's termination procedures are unfair even when followed faithfully. *Id.* ¶¶ 50, 52, 53, 57-59, 61, 63, 64. The Court can also disregard violations of the University's procedures alleged by the plaintiff but contradicted by the faculty manual's text. *Id.* ¶¶ 55, 80; ECF No. 11-1 at 28 (in the event of an appeal, faculty member is suspended without pay from the date of the termination notification), 27-32 (dismissal for cause process does not include a requirement for mediation).

The weightier alleged procedural violations, laid out more cogently in the hearing board's opinions than in the Complaint, cast doubt on how the evidence against plaintiff was collected, whether it was given disproportionate weight by the University, and whether the University administration acted pretextually to get rid of a faculty member at the center of multiple contentious relationships. But, as explained below, the identified procedural issues do not, in the context of this case, render the plaintiff's disparate treatment claim plausible.

In *Stonehill College*, the First Circuit reviewed the defendant college's successful motion to dismiss a student plaintiff's claims, which centered on a procedurally defective expulsion hearing. *Stonehill Coll.*, 55 F.4th at 315-16. The Circuit reversed the district court's dismissal of the plaintiff's breach of contract claim. *Id.* at 329-30. It affirmed, however, the district court's dismissal of the plaintiff's Title IX discrimination claim, reasoning that, while "the facts as alleged may plausibly suggest undue solicitude" to the female complainant, the plaintiff had not plausibly alleged that the University's biased treatment of the two parties was "attributable to sex rather than to some other reason, such as [the female student's] status as a complainant." *Id.* at 334-35.

The refrain of the Complaint and the minority hearing board opinion is that the plaintiff's termination was motivated by interpersonal conflicts. Like the plaintiff in *Stonehill*, this plaintiff has presented no facts plausibly linking that web of tense relationships, or the purportedly biased investigation, to her protected characteristics. Bias unconnected to any protected characteristic, not cognizable as a disparate treatment claim, presents the "obvious alternative explanation" for the alleged procedural irregularities. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).

"We cannot infer ... discrimination based on factual allegations that are 'just as much in line with' the non-discriminatory explanation [that the Court has] identified." *Frith*, 38 F.4th at 276 (quoting *Ocasio-Hernández*, 640 F.3d at 9). "As between [this] 'obvious alternative explanation[]' for" the purportedly problematic

termination process "and the 'purposeful, invidious discrimination [that the plaintiff] asks us to infer, discrimination is not a plausible conclusion.'" *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 682).

Moreover, when distinguished from the plaintiff and hearing board's objections to the termination procedures as written and even when followed, the submitted violations of the University's internal processes do not appear "so egregious" as to support, in and of themselves, an inference that the University was motivated by the plaintiff's protected characteristics. *Stonehill Coll.*, 55 F.4th at 335.

Taking all the plaintiff's factual allegations holistically and construing all inferences in her favor does not yield a plausible claim that her membership in any of the submitted protected classes played a role in her termination. She has failed to state a claim of disparate treatment.

### 2. Hostile work environment

The plaintiff also alleges that defendants subjected her to an unlawful hostile work environment related to her gender, race, sexual orientation, age, and religion in violation of RICRA, FEPA, Title VII, and the ADEA. Each of these statutes applies the same standard. *See DeCamp*, 875 A.2d at 21-23 (RICRA and FEPA); *Franchina v. City of Providence*, 881 F.3d 32, 45 (1st Cir. 2018) (Title VII); *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 91 (1st Cir. 2018) (ADEA).

A plaintiff must show that "(1) she is a member of a protected class; (2) she was subject to harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment was sufficiently severe or pervasive so as to alter

the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) there exists some basis for employer liability" to support a hostile work environment claim *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 10 (1st Cir. 2015). The facts presented by plaintiff do not permit a reasonable inference that she experienced either severe or pervasive harassment based on her membership in a protected class. *Cf. Flowers v. FLLAC Educ. Collaborative*, No. 18-1170, 2019 WL 10982432, at *2 (1st Cir. 2019) (affirming dismissal of hostile work environment claim for failing to plausibly allege the fourth and fifth elements of a prima facie case) (unpublished).

With a less threadbare showing of discriminatory animus, the plaintiff's colleagues' alleged behavior might serve as "atmospheric incidents relevant to her hostile work environment claim." *Flood*, 780 F.3d at 12; *see also Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 28 (1st Cir. 2002) ("[A]n act of harassment that is not actionable in and of itself may form part of a hostile work environment claim."). But the sum of relevant factual allegations potentially speaking to animus—Student D's remarks, detailed above, and the various comments by unspecified speakers presented in support of her age-based claim—do not allow the Court to connect the dots between the plaintiff's protected characteristics and the Complaint's reported intradepartmental machinations and backbiting.

Nor do the totality of alleged incidents plausibly suggest the severe or pervasive harassment required to sustain a hostile work environment claim. "[W]hether the environment is objectively 'hostile or abusive' must be answered with

22

reference to 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Marrero*, 304 F.3d at 18-19 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). That question is nevertheless "[s]ubject to some policing at the outer bounds," as here. *Id.* (quoting *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir. 2002)). While harassment may be either severe *or* pervasive, it "[n]evertheless...must pass a *certain* threshold of severity. Offhand comments and a tense or uncomfortable working relationship with one's supervisor are, without more, insufficient to support a hostile work environment claim." *Flood*, 780 F.3d at 12 (emphasis added). Taken together, the plaintiff's well-pled facts do not plausibly meet that threshold. She has thus failed to state a claim of a hostile work environment.

### 3. Retaliation

Finally, the plaintiff asserts that the institutional defendants retaliated against her in violation of Title VII and Title IX. The elements of a prima facie case of retaliation under these statutes are identical. *Ing*, 81 F.4th at 84. The plaintiff must "prove that (1) she engaged in protected conduct under Title VII [or Title IX]; (2) she suffered an adverse employment action; and (3) the adverse action was

causally connected to the protected activity." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (quoting *Marrero*, 304 F.3d at 22).

An employee has engaged in protected conduct "if she has either (1) opposed any practice made an unlawful employment practice by Title VII [or Title IX] or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the relevant statute. *Fantini*, 557 F.3d at 32 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)) (internal quotation marks omitted). When the alleged protected conduct involves "oppo[sing]" an "unlawful employment practice," a plaintiff must have "a good faith, reasonable belief that the underlying challenged actions of the employer violated" Title VII or Title IX. *Id.* (quoting *Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)).

The Complaint does not allege that the plaintiff engaged in any protected conduct. The plaintiff states that she was "retaliated against because she sought to teach in an environment of free speech and academic freedom"; this factually threadbare statement points to no employment practice that the plaintiff could have reasonably believed violated either anti-discrimination statute. (ECF No. 1-1 ¶ 81.) The Court is similarly unable to discern the nature of the plaintiff's long-standing disagreements with or grievance against Mitchell and cannot reasonably infer that this history involved protected conduct. The plaintiff has thus failed to state a claim of retaliation.

## C. Remaining State-Law Claims

Having dismissed all the plaintiff's federal and state anti-discrimination claims, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims in contract and tort.

"In a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256-57 (1st Cir. 1996); *see* 28 U.S.C. § 1367(c)(3) (allowing a district court to decline adjudication of remaining state-law claims after "all claims over which it has original jurisdiction" have been dismissed).

"In deciding whether or not to retain jurisdiction on such an occasion, the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche*, 81 F.3d at 257 (citing *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995)). "The preferred approach is pragmatic and case-specific." *Id.*

The circumstances support remanding the action to state court. The action is in its earliest stages, before discovery has begun and before any significant motions, other than the motion to dismiss, have been filed. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims and remands them to the state court where the plaintiff originally chose to bring them.

## IV.    CONCLUSION

The defendants' Motion to Dismiss (ECF No. 11) is GRANTED as to the plaintiff's state and federal anti-discrimination claims (Counts V-IX). The Court declines to exercise supplemental jurisdiction over the plaintiff's remaining state-law claims and REMANDS them to the Rhode Island Superior Court sitting in Newport, for the county of Newport.

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge

June 18, 2024